Issued June 23, 2020

Corrected June 23, 2020

**Supreme Court**

No. 2018-249-Appeal.
(PC 17-2840)

The City of Cranston        :

v.        :

International Brotherhood of Police        :
Officers, Local 301, et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

The City of Cranston        :

v.        :

International Brotherhood of Police    :
    Officers, Local 301, et al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The plaintiff, the City of Cranston (the City), appeals from a Superior Court judgment in favor of the defendants, the International Brotherhood of Police Officers, Local 301 (the Union); Daniel W. Nuey, Sr. (Nuey); and the Municipal Employees Retirement System (MERS). In his decision, the trial justice ordered the City to arbitrate the Union's grievance that was filed on behalf of Nuey, after the trial justice found that Nuey had not retired from his position as a Cranston police officer and thus remained a member of the bargaining unit. For the reasons set forth herein, we affirm the judgment of the Superior Court.[1]

**I**

**Facts and Travel**

On June 25, 2013, Nuey, a sergeant in the Cranston Police Department, left work early, claiming that he was experiencing "uncontrollable levels of stress and anxiety[.]" As a result, and

---

[1] During the pendency of the appeal, we granted the City's motion to stay the order compelling arbitration. Because we are affirming the judgment of the Superior Court ordering the arbitration to proceed, it follows that we vacate the stay.

with the agreement of the City, he began to receive injured-on-duty (IOD) benefits from the City. Pursuant to G.L. 1956 § 45-21.2-9, Nuey later applied for an accidental disability retirement.

While Nuey was receiving IOD benefits and while his application for an accidental disability retirement remained pending, he began working a second job. He was appointed to the Mashpee Wampanoag Tribe Gaming Authority Board of Directors by the Mashpee Wampanoag Tribal Council. As was required by the Department's rules and regulations, Nuey sought permission to engage in that employment while he was being compensated as a result of his IOD status. However, the Department rejected Nuey's request for outside employment because, it claimed, for it to approve Nuey's request, it needed to secure a medical opinion as to whether that employment would impede Nuey's recovery and thereby delay his return to work.[2] Nuey, undeterred, continued to serve on the Board of Directors of the Mashpee Wampanoag Tribe Gaming Authority, and he did not provide the requested materials to the Department.[3]

Sometime thereafter, Nuey's application for accidental disability retirement went before the Disability Subcommittee of the Retirement Board of the Employees' Retirement System of Rhode Island (ERSRI), which also administers MERS. The Disability Subcommittee voted to recommend that the Retirement Board deny Nuey's application for an accidental disability retirement, a recommendation that was accepted by the Retirement Board. Nuey then made a request that the decision be reconsidered, and he also filed a second application, this time seeking an ordinary disability retirement. Upon reconsideration, the Disability Subcommittee again voted

---

[2] As part of its communication with Nuey, the Department requested that Nuey have his employer send a letter describing the role and responsibilities of his secondary employment so that the Department could seek out a medical opinion. However, it is clear from the record that Nuey never provided such a letter.

[3] Although Nuey may have breached Department rules by working without permission, it cannot be disputed that the City has allowed injured officers to work while on IOD status. Therefore, Nuey's work without permission may not be considered as indicative of retirement.

to recommend that the Retirement Board deny Nuey's application for an accidental disability retirement. However, the Disability Subcommittee recommended favorably with respect to Nuey's application for an ordinary disability retirement. The Retirement Board voted to accept that recommendation on March 15, 2017 and granted an ordinary disability retirement to Nuey. Pursuant to § 45-21.2-9(f), Nuey then appealed the Retirement Board's decision denying his application for an accidental disability retirement to the Workers' Compensation Court.[4] However, he did not contest the Retirement Board's decision to grant him an ordinary disability retirement.

After his application for an ordinary disability retirement was granted, Nuey corresponded with the City about the decision to grant his application for an ordinary disability retirement. In that letter to the City, Nuey said that he would retire on the condition that the City make up the difference between what he would receive from an ordinary disability pension as opposed to an accidental disability pension.[5] Relevant to this appeal, Nuey requested that he "be put on the City's pension roll effective end of day immediately[,]" and he stressed the conditional nature of his offer.[6] Although the City denied Nuey's request for the supplemental pension, it nonetheless overrode the conditional nature of his offer and accepted Nuey's request to retire on an ordinary disability. Nuey then sent another letter, this time through counsel, withdrawing his offer to retire

---

[4] As of the date of the issuance of this opinion, the appeal is still pending before the Workers' Compensation Court.

[5] In his letter, Nuey referred to a Cranston ordinance. That ordinance says that, in a case in which a disabled police officer was denied an accidental disability retirement but awarded an ordinary disability retirement, the City "shall * * * [pay] directly to the [disabled] police officer" a supplemental pension to make up the difference between retirement allowance for an ordinary disability retirement and an accidental disability retirement. City of Cranston Code of Ordinances Ch. 2.20.080 (May 31, 2018). That ordinance was repealed in 2018 by Ordinance No. 2018-29, § 1 (Oct. 22, 2018).

[6] We have attached a copy of this letter as Appendix A to this opinion.

because the City had refused to accept his condition. The City, also through counsel, rejected Nuey's rescission, informing Nuey that the City would process his request to retire and remove him from the payroll. In addition, the City also stated that Nuey was no longer entitled to IOD benefits. A few days later, on May 12, 2017, the City put a stop to Nuey's IOD benefits and terminated his employment. At that time, the City, under the terms of its collective bargaining agreement with the police union, also compensated Nuey for outstanding vacation, sick, and personal days, as well as prorated longevity that he had accrued.[7]

The Union filed a grievance, alleging that the removal of Nuey from IOD status and from his employment violated the collective bargaining agreement between the City and the Union. The City promptly denied the grievance, after which the Union filed a demand for arbitration under the collective bargaining agreement. In response, the City filed a complaint for declaratory relief against the Union and Nuey, and it further sought to enjoin the Union from arbitrating the grievance. The City argued, among other things, that, because Nuey was retired and was no longer a member of the bargaining unit, the Union did not have standing to represent him. In its answer, the Union denied that Nuey was retired; the Union also moved to compel arbitration.

A dispute soon arose about whether an arbitrator or the trial justice should make the determination of whether the dispute was arbitrable. The trial justice, in a written decision, decided that he, not an arbitrator, should decide the preliminary issue of whether Nuey was retired or not. The trial justice reasoned that, if a determination was made that Nuey was in fact retired, then the Union would lack standing to pursue a grievance on his behalf, thus rendering the Union's

---

[7] The City, in its motion to reopen the record, provided an affidavit attesting that Nuey was paid $63,346.33 for these items.

grievance not arbitrable. However, he also reasoned that, if Nuey was not deemed to be retired, he would remain a member of the Union and therefore the Union's grievance would be arbitrable.

Before the trial, the Union moved to join MERS as a party because, in the Union's view, MERS had an interest in the outcome of the declaratory judgment action.[8] The trial justice granted the Union's motion, and he further informed MERS that it would be "free to present evidence, [and] to write brief[s]," but would not be required to do so.[9]

The parties agreed that the case should be tried upon an agreed statement of facts; however, the trial justice also informed the parties that they were free to call witnesses.[10] As part of the agreed statement of facts, the parties attached specific exhibits. The City, the Union, and MERS also filed memoranda to support their respective positions. As part of its memorandum, MERS attached a form that all members of ERSRI, including Nuey, are required to complete in order to receive an ordinary disability pension. That form (the MERS form), which was neither signed nor completed by Nuey, was referred to in the agreed statement of facts and was designated as "Employer Certification of Retirement and Final Wages," and stated:

> "By signing this form the member acknowledges that he/she has voluntarily made the decision to submit the completed form to [ERSRI] *which includes the member's date of termination* and projected final wages and service credits through the date of termination. The member further understands that if *he/she has made the determination not to terminate after submission of this form, he/she must notify ERSRI in writing immediately*. After the member's pension has been processed, no further contributions will be accepted after the date of termination provided on this form, and *once the member has cashed a pension check, the member's retirement is final and cannot be rescinded*." (Emphasis added.)

---

[8] Initially the Union moved to join ERSRI as a party; however, at the hearing on that motion, the Union orally modified its motion to join MERS instead of ERSRI.

[9] In both the Superior Court and this Court, MERS has declined to take a position as to whether Nuey's grievance is arbitrable.

[10] None of the parties chose to call witnesses.

At trial, the City argued that Nuey had been retired as a matter of law when the Retirement Board granted his application for an ordinary disability retirement. In the alternative, the City argued that, even if Nuey had not been retired as a matter of law, Nuey had in fact retired as a result of his conduct and activities. In contrast, the Union argued that the Retirement Board did not possess the statutory authority to unilaterally retire police officers. In addition, it argued that Nuey had not retired as a matter of fact either. For its part, MERS took no position as to the merits of Nuey's grievance or his rights under the CBA; however, MERS did take the position that it was not its role to retire employees. In staking out that ground, MERS attached to its written arguments the MERS form which retirees must complete and execute in order to verify separation of employment as of a given date.

After reviewing the record before him, and after considering the arguments of the parties, the trial justice ruled that Nuey had retired neither as a matter of law nor as a matter of fact. In his decision, the trial justice relied not only on the agreed statement of facts and the attached exhibits, but he also cited the MERS form as well as bringing to the case his own deep experience, acquired from a long career in the public sector. After the trial justice issued his bench decision, the City moved for the trial justice to reconsider his decision or, in the alternative, to reopen the record for additional evidence. As part of its motion, the City argued that the trial justice erred when he relied on the MERS form and on his own experience. The City also presented the affidavit of Francesca Solitro,[11] who attested to the amount of money, $63,346.33, that the City had paid to

---

[11] According to her affidavit, Francesca Solitro is the Payroll & Benefits Administrator for the City of Cranston.

Nuey as part of his termination payment. The Union objected to the City's motions and moved to compel arbitration.[12]

The trial justice denied the City's motions to reopen the factual record and to reconsider his decision. He also granted the Union's motion to compel arbitration. A judgment in favor of defendants was entered, followed by the City's timely appeal.

## II

## Issues on Appeal

On appeal, the City presents an array of arguments. First, the City contends that the trial justice erred when he determined that Nuey had not been retired as a matter of law as soon as the Retirement Board granted his application for an ordinary disability retirement. The City further maintains that the trial justice erred when he found that Nuey had not retired as a matter of fact, as a result of his own conduct. The City also argues that the trial justice erred when he admitted and considered the MERS form, which had been attached to the memorandum submitted by MERS. Finally, the City urges that the trial justice erred in denying its motion to reopen the record and reconsider his decision. We address each argument in turn.

## A

## Nuey's Employment Status

The central dispute in this case is whether Nuey retired. If that is the case, the Union lacks the standing to pursue a grievance on Nuey's behalf, making the dispute nonarbitrable. *Cf. Providence School Board v. Providence Teachers Union, Local 958, AFT, AFL-CIO*, 68 A.3d 505, 509 (R.I. 2013) (holding that a union did not have standing to represent retired employees because

---

[12] It appears from the record that, at a hearing on the City's reconsideration motion, the Union orally moved for an order compelling arbitration.

retirees were not part of the bargaining unit). On the other hand, if Nuey was not in a retired status, the grievance would be arbitrable because he remained a member of the bargaining unit.

## 1

## Standard of Review

The parties in this case dispute whether our review of the trial justice's decision should be *de novo* or, in the alternative, whether we should apply a more deferential standard. However, when we review a trial justice's decision in a case that is based on agreed-upon facts, our review is *de novo*. *Arena v. City of Providence*, 919 A.2d 379, 387 (R.I. 2007). "Questions of law and statutory interpretation are [also] reviewed *de novo* by this Court." *Morse v. Minardi*, 208 A.3d 1151, 1155 (R.I. 2019) (quoting *Hudson v. GEICO Insurance Agency, Inc.*, 161 A.3d 1150, 1153 (R.I. 2017)).

## 2

## Analysis

To begin, we must clarify the true inquiry governing the issue as to Nuey's employment status. The trial justice and the parties focus on two issues: (1) whether the Retirement Board can retire an employee by granting the employee's application for an ordinary disability retirement and (2) if the Retirement Board lacks that authority, whether Nuey retired by his conduct. Clearly, if the Retirement Board is vested with the authority to retire a municipal police officer, the inquiry is over and we would be drawn to the inescapable conclusion that Nuey had retired.

### a.

### The Authority of the Retirement Board

The City argues that the Retirement Board has the authority to unilaterally retire a municipal police officer after he or she applies for an ordinary disability retirement. To support

this argument, the City targets the language in G.L. 1956 § 45-21-19 that says that "the retirement board may retire the member for ordinary disability."

Before we turn to that specific issue, however, we deem it helpful to describe the various ways by which a municipal police officer might retire. Pursuant to chapter 21.2 of title 45 of the general laws, a police officer who is a member of MERS and who seeks to retire may do so under one of three alternatives. Each is addressed by a specific statutory provision. First, an officer can apply for a service retirement, based on the officer's age and length of service. Section 45-21.2-5. Second, an officer who is permanently disabled as a result of an injury that was sustained in the line of duty may apply for an accidental disability retirement. Section 45-21.2-9. Finally, and relevant to this case, an officer whom the Retirement Board has determined to be permanently disabled, but not as a result of an injury that was suffered in the line of duty, may apply for an ordinary disability retirement. Section 45-21.2-7. Each type of retirement provides a different benefit. Relevant to this case, an accidental disability pension is far more generous to the retiree than is an ordinary disability pension.[13]

Under the statutory framework for an ordinary disability, an officer "upon the [officer's] application or upon application of the employer," may "be retired on an ordinary disability retirement allowance, subject to the restrictions set forth in §§ 45-21-19, 45-21-20, 45-21-23, and 45-21-24." Section 45-21.2-7. Section 45-21-19 sets forth the specific requirements for an ordinary disability retirement. That statute says "[a]ny [officer] * * * upon the [officer's] own application or upon application of the employer, or some person acting in the [officer's] behalf" may "apply for ordinary disability retirement[.]" Section 45-21-19(a). If medical examinations

---

[13] For an ordinary disability retirement, a retired police officer receives his service retirement. General Laws 1956 § 45-21.2-8. However, for an accidental disability retirement, an officer would be entitled to two-thirds of his salary. General Laws 1956 § 45-21-22; *see* § 45-21.2-10.

"show that the [officer] is physically or mentally incapacitated for the performance of duty and ought to be retired," then "the retirement board may retire the [officer] for ordinary disability." Section 45-21-19(c). However, that does not complete the process. That is so because, after the Retirement Board grants an ordinary disability retirement, the officer must then complete various tasks, including the execution and filing of certain forms. One of the key documents is the MERS form on which the officer certifies that he has terminated his employment and the employer sets forth the officer's final wages so that the proper retirement allowance can be calculated.

From our review of the statutory framework, we have no hesitation in concluding that the Retirement Board is not vested with the authority to unilaterally retire a police officer for, in this case, an ordinary disability. Indeed, although it is necessary for the Retirement Board to grant an employee's application for an ordinary disability retirement before an employee may retire, the Retirement Board neither retires the employee nor terminates his employment with his employer. Not only does the text and structure of the retirement statutes mandate this result, but so does the plain and ordinary meaning of the words "retirement" and "retire."

In creating the Retirement Board, the General Assembly said that the Retirement Board was established "for the purpose of providing retirement allowances for employees of the state of Rhode Island[.]" General Laws 1956 § 36-8-2; *see* § 36-8-3. Section 36-8-1(16) defines "retirement allowance" as "annual payments for life made after retirement under and in accordance with chapters 8 to 10 of this title."

The language of § 36-8-2 does not indicate in any way that the General Assembly endowed the Retirement Board the statutory authority to unilaterally retire an employee. Instead, § 36-8-2 imbues the Retirement Board with the responsibility to, among other things, determine a covered employee's eligibility for retirement and to pay a retirement allowance, or a pension, to the eligible

member of the system, but only after he has terminated his employment and retired. Nothing in the language of chapter 8 of title 36 or chapters 21 or 21.2 of title 45 suggests that the Retirement Board is cloaked with the authority to sever the employment relationship between an employer and employee and thus to retire a municipal police officer. The issue of termination of employment is critical because retirement, in our view, embraces two elements: the Retirement Board's determination of the employee's eligibility, followed by the cessation of the employee's employment.

If the General Assembly intended to inextricably intertwine the Retirement Board in personnel or administrative issues between employees and their employers, it would have spoken with directness and clarity on that subject. *Providence Teachers' Union Local 958, AFT, AFL-CIO v. Hemond*, 227 A.3d 486, 491 (R.I. 2020). This, it would seem, is especially so in the relationship between municipalities and their police officers. Those relationships are governed by a complex statutory structure, collective bargaining agreements, individual departmental regulations and practices, and interpersonal relationships. The language of § 36-8-2 makes it clear that the Retirement Board's role is to determine eligibility of members of the retirement system who express an intent to retire, to maintain the finances of the public pension system, and to pay retirees the pensions that they have earned. It does not include the right or duty of the Retirement Board to interpose itself in any way on the employer-employee relationship.

The City focuses with myopic precision on the language "may retire the member for ordinary disability" in § 45-21-19(c). In our opinion, however, that language, which the City views in isolation, does not serve as a grant for the Retirement Board to terminate police officers from their employment and thereby to retire them.

Our opinion is buttressed by the meaning of the word "retirement." Our review of the retirement statutes reveals that the words "retirement" or "retire" are not defined. Although it is our opinion that there is no ambiguity in the relevant statutory framework, we nonetheless may look to the common meaning of a word, as defined in a dictionary, for its plain and ordinary meaning. *See Olamuyiwa v. Zebra Atlantek, Inc.*, 45 A.3d 527, 535 (R.I. 2012) ("It is well established that[,] 'when a statute does not define a word, courts will often apply a common meaning as provided by a recognized dictionary.'" (deletion and brackets omitted) (quoting *Planned Environments Management Corp. v. Robert*, 966 A.2d 117, 123 (R.I. 2009))). Black's Law Dictionary defines "retirement" as the "[*t*]*ermination of one's own employment* or career, esp[ecially] upon reaching a certain age or for health reasons[.]" Black's Law Dictionary 1574 (11th ed. 2019) (emphasis added).[14] That illustrates with clarity that voluntary retirement requires that an employee make the decision to terminate his own employment and that that decision is not ceded to anyone else.[15]

Finally, our opinion is further supported by the actions of the Retirement Board when it passed on Nuey's application for ordinary disability. The MERS form, sent to Nuey after the Retirement Board granted his application, indicates not only that Nuey was required to certify that he had terminated his employment, but also that, if he changed his mind about his decision to retire, he would be required to notify the Retirement Board. The power to rescind the decision to retire, according to MERS as articulated on the form, ends only if Nuey, in this case, was to cash a pension check. This language can only lead to the conclusion that the Retirement Board itself

---

[14] We note that although the statute uses the word "retire," the word "retirement" is analogous.

[15] Although Black's Law Dictionary includes reference to involuntary retirement, that issue is not presently before us and therefore we do not address it. *See H.V. Collins Company v. Williams*, 990 A.2d 845, 847 (R.I. 2010) ("[W]e shall not address moot, abstract, academic, or hypothetical questions.") (quoting *Morris v. D'Amario*, 416 A.2d 137, 139 (R.I. 1980))).

does not consider that it has the authority to unilaterally retire a police officer or any other employee. Indeed, the Retirement Board requires affirmative action by the employee before it will even process the payment of a retirement allowance.

The City, to support its argument that an employee is retired upon the Retirement Board's granting of the employee's application, draws this Court's attention to our holdings in *Costantino v. Employees' Retirement System of City of Providence*, 111 R.I. 113, 300 A.2d 51 (1973), and *Marro v. General Treasurer of City of Cranston*, 108 R.I. 192, 273 A.2d 660 (1971).[16] However, it is our opinion that neither of those cases has any applicability or relevancy to the case before us.

The City maintains that our holding in *Costantino* directly undergirds its position that the Retirement Board effectively retires an employee when it grants the employee's application. In *Costantino*, we held that "once an employee" who was a member of the Providence pension system, as it existed at the time, "submits his retirement application to the board and it is accepted, his status is no longer that of a member of the system but rather he then becomes a beneficiary * * * whose benefits will be paid at some future date." *Costantino*, 111 R.I. at 115, 300 A.2d at 52. However, *Costantino* is both factually and legally inapposite. *Costantino* involved a non-police municipal employee, Costantino, who retired from his position but deferred the receipt of his pension benefit until he attained a certain age. *Id.* at 113-14, 300 A.2d at 51-52. However, during the course of his pension payment deferment, the General Assembly modified the pension calculation for members of the system. *Id.* at 114, 300 A.2d at 52. That modification would have

---

[16] The City also relies on several out of state jurisdictions to support its argument. *See Williams v. City of Los Angeles*, 281 Cal. Rptr. 21 (Cal. Ct. App. 1991); *Morgan v. Board of Trustees of Teachers' Pension and Annuity Fund*, 1 A.2d 30 (N.J. 1938); *People ex rel. Eberle v. LaGuardia*, 21 N.Y.S.2d 239 (N.Y. Sup. Ct. 1940); *Appeal of Moore*, 492 P.2d 1091 (Okla. 1972). However, the City has not demonstrated any connection between how the retirement laws in those jurisdictions compare to the relevant Rhode Island retirement statutes. Therefore, the holding in those cases are not persuasive with regard to the issue before us here.

entitled Costantino to a higher pension payment. *Id.*  Costantino, who was no longer working for the city, sought to claim the higher payment by arguing that he was still a member of the pension plan, and not a beneficiary. *Id.* at 114-15, 300 A.2d at 52.  At that time, the Court explained that the statute meant that "any employee who becomes a member of the system and who during any subsequent period of six consecutive years spends half that time off the city payroll automatically loses his status as a member of the system." *Id.*  Costantino argued, in part, that this statute meant that he had three additional years after he retired to be considered a member of the system. *Id.* This Court rejected that argument and held that Costantino became a beneficiary of the system when he retired, and not three years later when he began drawing funds. *Id.*

We are therefore confident that the City's reliance on our holding in *Costantino* is misplaced.  Unlike the case before us now, there was never a question in *Costantino* about whether Costantino had retired.  Instead, the issue was whether a retiree could still claim to be a member of the retirement system, even after retirement, because of a specific statute.   Because both the issue and the facts in that case are markedly different from those of this case, our holding in *Costantino* has no bearing on the issues presented here.

The City also relies on our holding in *Marro*; however, our decision in *Marro* is wholly irrelevant to the current controversy.  The issue in *Marro* was whether the pension rights of a disabled police officer were governed by the city's charter or by state law. *Marro*, 108 R.I. at 196, 273 A.2d at 662.  In other words, the issue had nothing to do with whether the General Assembly gave the Retirement Board the authority to unilaterally retire a police officer as a matter of law. *See id.*

The City's next argument is that, if the Retirement Board does not have the authority to retire a police officer, a police officer could evade retirement and thus continue to receive IOD

benefits indefinitely, at great expense to taxpayers. In the City's view, this would lead to an absurd result. We do not agree.

We have said that "if a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, this Court will look beyond mere semantics and give effect to the purpose of the act." *O'Connell v. Walmsley*, 156 A.3d 422, 428 (R.I. 2017) (brackets omitted) (quoting *Commercial Union Insurance Co. v. Pelchat*, 727 A.2d 676, 681 (R.I. 1999)). However, nothing in our reading of this statutory scheme defeats the purpose of either chapter 8 of title 36 or chapters 21 or 21.2 of title 45. The plain language of chapter 8 of title 36 does not indicate that the Legislature intended that the Retirement Board has the authority to retire employees on its own or sever the employment relationship between members of the retirement systems and the relevant municipalities. *See Hemond*, 227 A.3d at 493. Rather, it is clear to us that the Legislature's intent in enacting this statutory structure is that the Retirement Board is cloaked with the authority to determine eligibility, manage the financing of the retirement system, and compensate eligible members of the retirement system by paying the appropriate retirement benefit after they have retired and ended their employment. Section 36-8-2; *see Hemond*, 227 A.3d at 493.

As to the City's argument concerning IOD benefits, we do not agree with the City's view that police officers will be able to indefinitely collect IOD benefits as a result of the Retirement Board not having this authority.[17]

---

[17] Although the merits of the issue of whether the City improperly terminated Nuey's IOD benefits is not before us and is the subject of the demand for arbitration filed by the Union, it should be noted that not only did the City voluntarily place Nuey on IOD status, but it has never sought to make use of its rights under the collective bargaining agreement to challenge Nuey's status.

**b.**

**Has Nuey, by His Actions, Effectively Retired from the City?**

The City also contends that Nuey had *de facto* retired by applying for a disability pension, informing the City that he intended to retire, and accepting secondary employment without the required permission of the City.[18]

In our view, the City's arguments that Nuey's actions evinced an intent to retire, or that he had retired as a result of his conduct, are without merit. The critical aspect of this inquiry is whether Nuey terminated his own employment, not whether at one time or another he indicated his intent to do so. If an employee's intent at any given time was the sole focus, then perhaps Nuey could have been considered to be retired when he filed his application, because at that time he did expressly demonstrate an intent to retire. Such a holding, however, would, in our opinion, fly in the face of the statutes governing retirement.

It is undisputed that Nuey sent a letter to the City in which he expressed a present intention to retire. However, that correspondence makes it clear that Nuey offered to retire on an ordinary disability pension if, and only if, the City agreed to make up the difference between an ordinary disability pension and an accidental disability pension pursuant to a municipal ordinance. However, because the City rejected Nuey's offer, the letter could not and did not effectuate Nuey's retirement. Nuey wrote:

> "I am requesting the City to award the difference in pension benefits equaling 66 2/3% as stated in the City of Cranston Municipal Code * * *.

> "* * * I respectfully request to be put on the City's pension roll effective end of day *immediately upon the passage of this request * * *.*

---

[18] As to the City's arguments with respect to Nuey's secondary employment, we already have addressed that issue *supra*.

> "With these terms in mind, please let this serve as notice of my retirement from the Cranston Police Department as of the end of day immediately following *the passage of this request*[.]" *See* Appendix A (emphasis added).

In two separate sentences, Nuey stressed that his notice of retirement was contingent upon the City granting his request to have his ordinary disability pension supplemented by City funds. The City, in its response, rejected Nuey's condition but nevertheless retired him. Therefore, because the City failed to accept the terms of Nuey's offer, the letter did not effectuate his retirement.

## B

## MERS Evidence

The City next argues that the trial justice erred when he relied on the form attached to MERS's pretrial memorandum, because the form was not part of the agreed statement of facts. However, we need not address this issue because we are of the opinion that the City has waived any argument before this Court about whether the trial justice relied on facts not in the record. This is so because the City has not engaged in any meaningful discussion of the issue in its briefing to this Court. Rather, the City devotes some conclusory statements and a footnote to its arguments concerning the admission of the MERS form. Therefore, the City has waived this issue before this Court. *See Broccoli v. Manning*, 208 A.3d 1146, 1149 (R.I. 2019) ("This Court generally deems an issue waived 'when a party simply states an issue for appellate review, without a meaningful discussion thereof.'" (quoting *A. Salvati Masonry Inc. v. Andreozzi*, 151 A.3d 745, 750 (R.I. 2017))).

# C

## Motion to Reconsider/Motion to Reopen the Record

Finally, the City argues that the trial justice erred in denying its motion to reconsider and to reopen the record.

### 1

### Standard of Review

It should be noted at the outset that the Superior Court Rules of Civil Procedure do not provide for a motion to reconsider. *School Committee of City of Cranston v. Bergin-Andrews*, 984 A.2d 629, 649 (R.I. 2009). However, this Court liberally interprets the rules and "look[s] to substance, not labels." *Id.* (quoting *Sarni v. Meloccaro*, 113 R.I. 630, 636, 324 A.2d 648, 651 (1974)). "Historically, we have allowed 'motions to reconsider' to be treated as motions to vacate under Rule 60(b) of the Superior Court Rules of Civil Procedure[.]" *Id.* However, in reviewing the City's motion to reconsider, the City relied on Rule 52(b) of the Superior Court Rules of Civil Procedure as grounds for requesting that the trial justice reopen the record and to reconsider his decision in light of new findings. Inherent in a Rule 52(b) motion is the trial justice's discretion. Therefore, we will review the trial justice's decision under an abuse-of-discretion standard.

### 2

### Analysis

It is our conclusion that the City's argument that the trial justice abused his discretion by refusing to reconsider his decision and to reopen the record is wholly without merit. Not only was the trial justice well within his discretion to deny the City's motion, but we also are in complete agreement with the trial justice's rationale.

Rule 52(b) permits a trial justice, upon a motion of a party filed within ten days after entry of judgment, to amend his findings of fact or make additional findings of fact that in turn can be the basis to amend the judgment. Here, the City proposed that the trial justice reopen the record and consider an affidavit from Francesca Solitro, an employee of the City, attesting to the amount of the termination payment the City paid to Nuey. The City argued that the trial justice should amend his findings concerning the termination payment to include that amount. The City further argued that, in light of Nuey's acceptance of that substantial payment, the trial justice should reconsider his decision.

When he denied the motion, the trial justice specified that he had considered the fact that Nuey had received the termination payment. He also noted that the fact that such a payment was made was set forth in the agreed-upon facts. However, the trial justice made it clear that the amount of the termination payment that Nuey accepted was not relevant. We are also at a loss as to the relevance of Nuey's acceptance of the amount of the termination payment. We therefore hold that the trial justice was well within his discretion in denying the City's motion to reopen the record.

As to the City's other arguments concerning whether the trial justice should have reconsidered his decision, most, if not all, are a rehashing of the arguments about Nuey's retirement status that already had been rejected by the trial justice. We have addressed those arguments, and we need not address them again. Finally, whether the trial justice strayed beyond the bounds of his considerable discretion when he declined to reconsider his decision does not affect our *de novo* review of the issues on appeal.

### III

### Summary

We therefore conclude that Nuey did not retire because he did not terminate his employment in the normal course and thereby effectuate his retirement by his actions. Thus, because Nuey is not a retiree, the Union has standing to pursue a grievance on his behalf. *Cf. Providence School Board*, 68 A.3d at 509 (holding that a union does not have standing to represent retired employees because retirees are not part of the bargaining unit). Because the Union has standing, its grievance is substantively arbitrable and thus the trial justice did not err when he granted the Union's motion to compel arbitration.

### IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

# Appendix A

"A Nationally Accredited Agency"

5 Garfield Avenue
Cranston, Rhode Island 02920
Phone (401) 942-2211 TDD 943-1410
Fax (401) 477-5113



March 21, 2017

Honorable Allan W. Fung, Mayor and
Members of the Cranston City Council
Cranston, RI

Dear Mayor Fung:

On March 15, 2017, I was awarded an "Ordinary Disability" after being denied an "Accidental Disability" by the RIState Retirement Board. As a result, I am requesting the City to award the difference in pension benefits equaling 66 2/3% as stated in the City of Cranston Municipal Code section 2.20.080, entitled "Injured on Duty Pension Disability Entitlement."

Therefore, I respectfully request to be put on the City's pension roll effective end of day immediately upon the passage of this request, in accordance with the Police Department Pension Ordinance and confract language.

With these terms in mind, please let this serve as notice of my retirement from the Cranston Police Department as of end of day immediately following the passage of this request and ask to be placed on the City Council Docket for the March 27th date of council meeting PRIOR to requested retirement meeting. Thank you.


Respectfully        Submitted,

        Daniel W. Nuey Sr.


cc:

        City Clerk
        City Council President

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | The City of Cranston v. International Brotherhood of Police Officers, Local 301, et al. |
| **Case Number** | No. 2018-249-Appeal. (PC 17-2840) |
| **Date Opinion Filed** | June 23, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Richard A. Licht |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>William K. Wray, Jr., Esq.<br>William M. Dolan, Esq. |
| | For Defendants:<br><br>Carly Beauvais Iafrate, Esq.<br>Michael P. Robinson, Esq.<br>Elizabeth A. Wiens, Esq. |

SU-CMS-02A (revised June 2016)